AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT
## for the
### Northern District of New York

FILED

NOV 2 2 2017

AT _____ O'CLOCK _____
Lawrence K. Baerman, Clerk - Albany

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) |
| | ) Case No.   17-MJ- 521 (CFH) |
| | ) |
| MOJTABA BIRIA, | ) |
| | ) |
| | ) |
| Defendant. | ) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.  On or about the dates of August 1, 2017 through and including November 20, 2017, in the county of Saratoga in the Northern District of New York, and elsewhere, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 50 U.S.C. § 1705(a), (c), 31 C.F.R. Part 560; 18 U.S.C. § 371; and 18 U.S.C. § 1956(a)(2)(A), (h) | Conspiracy to violate the International Emergency Economic Powers Act and the Iranian Transactions and Sanctions Regulations; conspiracy to defraud the United States; and conspiracy to commit international money laundering |

This criminal complaint is based on these facts:
Please see attached affidavit.

☒   Continued on the attached sheet.

Attested to by the Applicant in Accordance with the Requirements of Rule 4.1 of the Federal Rules of Criminal Procedure.

Sworn to before me and signed in my presence.

Date:   11/22/2017

City and State:   Albany, NY

_____
*Complainant's signature*

Department of Commerce Special Agent Gina Makowski
_____
*Printed name and title*

_____
*Judge's signature*

Hon. Christian F. Hummel, U.S. Magistrate Judge
_____
*Printed name and title*

**Affidavit in Support of a Criminal Complaint**

I, **Gina Makowski**, Special Agent of the U.S. Department of Commerce, Bureau of Industry and Security, Office of Export Enforcement, being duly sworn, depose and state:

1.      I make this affidavit in support of an application for a criminal complaint charging MOJTABA BIRIA ("BIRIA") with the following offenses:

    a.  conspiracy to violate the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1705(a), (c), and the Iranian Transactions and Sanctions Regulations ("ITSR"), 31 C.F.R. Part 560;

    b.  conspiracy to defraud the United States in violation of 18 U.S.C. § 371; and

    c.  conspiracy to commit international money laundering in violation of 18 U.S.C. § 1956(a)(2)(A), (h).

2.      There is probable cause to conclude that BIRIA and OLAF TEPPER ("TEPPER") are willfully conspiring with each other, and possibly with others known and unknown, to re-export and cause to be re-exported, directly or indirectly, from the United States to Iran, or the Government of Iran, gas turbine parts, without prior authorization from the United States Department of the Treasury, Office of Foreign Assets Control (OFAC), and to engage in transactions that evade or avoid, or have the purpose of evading or avoiding, any of the prohibitions contained in the ITSR, including prohibitions against the unauthorized exportation of goods from the United States to a third country if the goods are intended or destined for Iran.

3.      I have been a Special Agent of the Department of Commerce ("DOC"), Bureau of Industry and Security, Office of Export Enforcement for more than 6 years and am assigned to

the New York Field Office. My experience as a Special Agent includes conducting criminal investigations in New York, New Jersey and Pennsylvania of alleged violations of the export laws of the United States. During my employment with the DOC, I have received extensive training in both investigative procedures and evidence recovery. I am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 50, United States Code, Sections 1701-1706.

4.      The information set forth in this affidavit was obtained during the course of this investigation, including through personal observations, my review of federal agency reports, other documents and other evidence, and from information communicated to me by other law enforcement officers. Because this affidavit is submitted for the limited purpose of seeking the issuance of a criminal complaint and arrest warrant, it does not include every fact known to me concerning this investigation.

### Export Laws and Regulations

5.      Pursuant to the International Economic Emergency Powers Act (IEEPA), 50 U.S.C. §§ 1701-06, the President of the United States was granted authority to deal with unusual and extraordinary threats to the national security and foreign policy of the United States. Section 1705 provides in pertinent part:

>       (a)      It shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under this chapter.
>
>       ...

2

(c)     A person who willfully commits, willfully attempts to commit, or willfully conspires to commit, or aids or abets in the commission of, an unlawful act described in subsection (a) of this section shall, upon conviction, be fined not more than $1,000,000, or if a natural person, may be imprisoned for not more than 20 years, or both.

6.     On March 15, 1995, the President issued Executive Order (E.O.) 12957, finding that "the actions and policies of the Government of Iran constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States," and on that date declared a national emergency to deal with that threat.  On May 6, 1995, the President issued E.O. 12959, taking action concerning Iran in addition to that set forth in E.O. 12957.  On August 19, 1997, the President issued E.O. 13059, clarifying the actions taken in E.O. 12959 and 12957.

7.     To implement the aforementioned Executive Orders, OFAC issued the Iranian Transactions and Sanctions Regulations (ITSR), 31 C.F.R. Part 560.  With certain limited exceptions not applicable here, the ITSR prohibit, among other things, the export, re-export, sale, or supply, directly or indirectly, from the United States or by a United States person, wherever located, to Iran or the Government of Iran, or the financing of such export, re-export, sale, or supply, of any goods, technology, or services, without prior authorization from OFAC.  These regulations further prohibit any transactions that evade or avoid or have the purpose of evading or avoiding any of the prohibitions contained in the ITSR, including the unauthorized exportation of goods from the United States to a third country if the goods are intended or destined for Iran. The ITSR impose, among others, the following prohibitions:

**§ 560.203: Evasions; attempts; causing violations; conspiracies.**
(a) Any transaction on or after the effective date that evades or avoids, has the purpose of evading or avoiding, causes a violation of, or attempts to violate any of the prohibitions set forth in this part is prohibited.

3

(b) Any conspiracy formed to violate any of the prohibitions set forth in this part is prohibited.

**§ 560.204 Prohibited exportation, reexportation, sale, or supply of goods, technology, or services to Iran.**
Except as otherwise authorized pursuant to this part, and notwithstanding any contract entered into or any license or permit granted prior to May 7, 1995, the exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of any goods, technology, or services to Iran or the Government of Iran is prohibited, including the exportation, reexportation, sale, or supply of any goods, technology, or services to a person in a third country undertaken with knowledge or reason to know that:
(a) Such goods, technology, or services are intended specifically for supply, transshipment, or reexportation, directly or indirectly, to Iran or the Government of Iran; or
(b) Such goods, technology, or services are intended specifically for use in the production of, for commingling with, or for incorporation into goods, technology, or services to be directly or indirectly supplied, transshipped, or reexported exclusively or predominantly to Iran or the Government of Iran.

8.      At all times relevant to this Complaint, the President has continued the national emergency with respect to Iran and E.O. 13059, 12959, and 12957.  The most recent continuation of this national emergency was on January 13, 2017.

### Facts Supporting a Finding of Probable Cause

9.      TEPPER and BIRIA are German citizens.  BIRIA is originally from Iran. TEPPER and BIRIA work for Energy Republic, a German company.   TEPPER founded the company.  According to Energy Republic's English-language web site (http://www.energyrepublic.de/EnergyRepublic/Team_2.html), TEPPER is Energy Republic's Managing Director, and BIRIA is the company's Technical Managing Director.

10.     On September 28, 2017, OFAC confirmed to investigators that "[u]nless otherwise authorized, the export of gas turbine parts directly or indirectly from the United States or by a U.S. person to Iran is prohibited pursuant to the Iranian Transactions and Sanctions

4

Regulations, 31 C.F.R. part 560 (the 'Regulations'), issued under the authority of the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701-06, and other statutes." OFAC has confirmed that neither TEPPER nor BIRIA nor Energy Republic has an OFAC license that would permit them to export to Iran, or has applied for such a license.

11.     Energy Republic is a longtime customer of Company A, based in Saratoga County, New York.  Company A exports gas turbine parts all over the world; these are replacement parts to be installed in gas turbine engines, which are typically used in power plants. Energy Republic and Company A have a number of open contracts.  Pursuant to these open contracts, Energy Republic has ordered and paid for energy turbine parts, which Company A has shipped mainly to Germany and sometimes to other, non-sanctioned countries, but never to Iran.

12.     During the last few months, TEPPER and BIRIA have been trying to get Company A to ship to Energy Republic, in Germany, gas turbine parts valued at approximately $1 million.  In October 2017, TEPPER sent to "Representative A," a person working for Company A, several emails and WhatsApp phone messages in which he offered an immediate payment of $300,000 or $400,000 for the parts, with the remaining money to be guaranteed by both Energy Republic and TEPPER personally.  All communications between Representative A, TEPPER and BIRIA have been in English.

13.     Export control laws prohibit the export or re-export of these energy turbine parts to Iran without an OFAC export license.  The evidence demonstrates that TEPPER and BIRIA worked together with the intent to acquire the turbine parts from Company A and then re-export at least some of them to a company or companies in Iran.

14.     On October 26, 2017, an employee of Energy Republic (hereinafter, "Energy Republic Employee") sent an email to Representative A titled "Overview contracts / inquiries / repayment [Company A]." Attached to this e-mail was an Excel spreadsheet, which identified multiple contracts, purchase requests and purchase orders between Company A and Energy Republic. One item was described as "2. MS5002D Tabriz." Tabriz is a city in Iran, in Eastern Azerbaijan Province. Another item was described as "2. MS5002D Krhoye." Open-source queries for "Krhoye" were negative. MS5002D is a type of gas turbine.

15.     On October 26, 2017, TEPPER and BIRIA flew from Germany to the United States, entering the country at Boston's Logan International Airport, for the purpose of meeting Representative A to discuss the proposed approximately $1 million transaction. TEPPER informed Representative A of their travel plans ahead of time via WhatsApp messages, and he and Representative A scheduled a meeting for the morning of October 27 in Saratoga County, New York. TEPPER and BIRIA also scheduled and ended up taking a return flight to Germany, from Newark, New Jersey, on the evening of October 28.

16.     TEPPER and BIRIA were separately interviewed in Boston on October 26, during a secondary U.S. Customs inspection at Logan Airport.

17.     BIRIA advised officers, including me, that he was traveling to the United States for pleasure and would be staying until October 31, 2017; that he was staying in Boston and did not have plans to leave the city; that he was retired but sometimes helped out TEPPER with his turbine business; and that he would not be participating in any business while in the United States and that he would not be meeting with any U.S.-based companies. When asked about Company A (as some Company A-Energy Republic invoices were found in his luggage), BIRIA

6

said that he was helping TEPPER with a business deal but that they were not in the United States to discuss this deal nor meet with Company A representatives.   When I asked him if he was familiar with U.S. export regulations and restrictions, including as they applied to sanctioned countries including Iran, North Korea and Sudan, BIRIA stated that he was.

18.     TEPPER and BIRIA also filled out U.S. Customs entry forms in which each stated that the primary purpose of their trip was not business.

19.     Following secondary inspection at the airport on October 26, TEPPER and BIRIA were released from inspection and admitted to the country.

20.     The following morning, on October 27, they met with Representative A at a hotel in Saratoga County, New York, driving more than 3 hours from Boston.  FBI Agents audio- and video-recorded this meeting.

21.     During the approximately 100-minute meeting, TEPPER and BIRIA made numerous statements, in fluent English, that demonstrate they were aware that the gas turbine parts that they wanted to buy from Company A could not be exported or re-exported to Iran; that they were intending to circumvent those laws; and that they knew their conduct was unlawful.

22.     During the meeting, Representative A discussed with TEPPER and BIRIA the spreadsheet sent the day before by Energy Republic Employee that had the entries "2. MS5002D Tabriz" and "2. MS5002D Krhoye," as follows:

**REPRESENTATIVE A:** Now, just so we are clear.  You understand the restrictions that I am under.

**BIRIA:** I know, I know.

**REPRESENTATIVE A:** You have been aware of that so, you see these two lines here?

**BIRIA:** Yes.

**REPRESENTATIVE A:** So that's, that's a problem.

**BIRIA:** Why?

**REPRESENTATIVE A:** I know where those, those, those are located.

**BIRIA:** I know.

**REPRESENTATIVE A:** I know, so that, you know that's-

**BIRIA:** Where is the power plant?

**REPRESENTATIVE A:** Where is the power plant? Tabriz is in-

**BIRIA:** Tehran.

**REPRESENTATIVE A:** It is in Iran. So I can't, you know, that's that's-

**TEPPER:** So we have to renew it.

**BIRIA (to TEPPER):** Why he [Energy Republic Employee] is writing the name? Why?

**REPRESENTATIVE A:** So, but just.

**BIRIA:** Why? I know.

**REPRESENTATIVE:** So, OK. You're aware-

**TEPPER:** So officially we have to stop business on this one, yeah?

**BIRIA (to TEPPER):** Don't write the names-

**REPRESENTATIVE A:** Right, the the, well, the, you know-

**BIRIA (to TEPPER):** Why is, why is that? He is not supposed to-

**REPRESENTATIVE A:** We understand that, ah, it goes to Germany or an EU country or non-sanctioned countries.

**BIRIA (nodding):** Yeah.

**REPRESENTATIVE A:** That's the understanding and that's how we've always worked it.

8

23.     Later in the conversation, they returned to the subject of the Excel spreadsheet sent by Energy Republic Employee, as follows:

**BIRIA**: The thing is, if we manage the Frame 5-2 shafts, very good according to the schedule of the end user, OK, then I can ask him to give me second order of this.

**REPRESENTATIVE A**: Sure, OK.

**BIRIA**: Which is up to 1 million dollar.

**REPRESENTATIVE A**: That's fine. I was looking at, you know-

**BIRIA**: Because-

**REPRESENTATIVE A**: This all looks good on paper.

**BIRIA**: Yes.

**TEPPER**: Except where, where we have these two names of the power stations. This is-

**BIRIA**: They shouldn't-

**REPRESENTATIVE A**: Yeah I can't-

**BIRIA**: should not write the names of the power stations.

**REPRESENTATIVE A**: You understand, and everyone's aware of the restrictions.

**TEPPER**: Yeah, yeah.

**BIRIA**: Why they [Energy Republic Employee] put the name?

**TEPPER**: But this is, I have the original here.

**REPRESENTATIVE A**: That's all right, we can just, you know. I want to talk about business that is legitimate and going to places that are not restricted.

24.     Later in the day on October 27, Energy Republic Employee sent an email to Representative A titled "Charts."  Attached to this e-mail was an Excel spreadsheet similar to the

one that Energy Republic Employee sent the day before, except on this newer spreadsheet, "2. MS5002D Tabriz" and "2. MS5002D Krhoye" were each changed to "2. MS5002D."

25.      Also during the October 27 meeting, TEPPER and BIRIA made additional statements regarding the ultimate destination of the gas turbine parts and their knowledge that shipment of those parts to Iran would violate U.S. export control laws.  In the following excerpt, BIRIA specifically referred to MAPNA, a major power company in Iran:

**BIRIA:**  You are going to deliver the, your parts for the, MAPNA is ready all of them.

**TEPPER:** Mr. Biria, he cannot ship to them.

**BIRIA:**  Because I am preparing the money for them.

**REPRESENTATIVE A:** I understand but you know you are talking about situ-, places that I can't ship to.

**BIRIA:**  Three shipments, three shipment.

**REPRESENTATIVE A:**  Ok.

**TEPPER:** Don't, don't mention your end user, ok?

**BIRIA:**  OK.

**REPRESENTATIVE A:** I know.  You put me in a a very bad situation.  I, I, I can't ship there.

**BIRIA:**  No.

**REPRESENTATIVE A:**  I am restricted and I, and just so you know, anything from. There will be paperwork associated with anything that you have to fill out.

**BIRIA:**  Yes.

**REPRESENTATIVE A:**  And that's, you know.  Restrictions have always been in place as you know.

**BIRIA:**  Yes, yes.

**REPRESENTATIVE A:** And now, it's getting much more restrictive, too, so.

**BIRIA:** Well the question is that if we get the money for the second shipment, your part is ready?

**REPRESENTATIVE A:** Right, absolutely.

**TEPPER:** So we are talking about Frame 5 dual shaft?

**BIRIA:** Dual shaft.

**REPRESENTATIVE A:** Dual shaft.

26.     About a minute later in the conversation, BIRIA told Representative A: "in two weeks I will send you the money. That's it. I have the money in Tehran."

27.     Toward the end of the meeting, BIRIA suggested to Representative A that Representative A could just blame Energy Republic if the parts ended up in Iran:

**REPRESENTATIVE A:** If that's the case, Mr. Biria, if you're telling me these parts are going to a place that is a sanctioned country, then I can no longer-

**BIRIA:** Yes, I know.

**REPRESENTATIVE A:** That is, that is the rule. So you understand the rules.

**BIRIA:** But if, if, if I take these parts, and I sell it in Europe, and your representation in Europe come and say why you selling this in Europe?

**REPRESENTATIVE A:** I don't have any representation in Europe-

**BIRIA:** For example.

**REPRESENTATIVE A:** For example.

**BIRIA:** For example. OK? Then you blame us, why are you selling this in Europe?

**REPRESENTATIVE A:** Sure, I would say the same thing, yes, but it's a different situation.

**TEPPER:** Yeah.

11

28.    Throughout the October 27 meeting, TEPPER and BIRIA told Representative A that they were ready to send $400,000 to Company A, as a down payment for the gas turbine parts worth approximately $1 million.

29.    On October 30, 2017, TEPPER emailed to Representative A a Memorandum of Meeting ("Memorandum"), memorializing the agreement discussed at the October 27 meeting, and then reached subsequent to that meeting. The Memorandum states that (a) Energy Republic will provide a company guarantee, backed by TEPPER's personal guarantee; (b) Energy Republic will transfer $400,000 (U.S. dollars) to Company A's account; (c) Company A will confirm, upon receipt of $400,000, that it will ship the following items: "BU1PO468 – DLN fuel nozzle," "BU1PO898 – 1st shipment of MS5002D order," and "BU1PO393 – Remaining shipment of 5 sets FR5 (2 X N1 + 1 X B1)"; (d) and that the process will be completed by the end of November 2017 at the latest.

30.    On October 30, 2017, Representative A emailed TEPPER asking "So when can we expect the payment of $400,000.00 discussed?" Tepper responded, by email that same day, "End of the week, after you have signed the MoM :-)," referring to the Memorandum.

31.    On October 30, 2017, TEPPER emailed Representative A an attachment that was the guarantee discussed at the October 27 meeting and in the Memorandum.

32.    On November 2, 2017, TEPPER and Representative A exchanged the following communications through WhatsApp:

> **TEPPER:** ar eyou [sic] okay?
>
> **REPRESENTATIVE A:** Fine. Why?
>
> **TEPPER:** a bit concernt [sic] about the customs inspection recently in BOS A/P [Boston Airport]

12

**REPRESENTATIVE A:** Sign of the times here in US

**REPRESENTATIVE A:** All good here

**TEPPER:** do we get the signatures today. I have only 2 hrs to buy USD [U.S. dollars]!

**REPRESENTATIVE A:** If [Company A's owners] ever appear today. Just need their final OK.

**TEPPER:** [transmits images of two thumb-up signs]

33.     On November 7, 2017, Energy Republic Employee sent an email to Representative A that said in pertinent part, "... please find attached the requested MoM [Memorandum] on ER [Energy Republic] letterhead." Later that same day, Representative A replied via email to Energy Republic Employee and sent a digital copy of the aforementioned Memorandum with Representative A's digital signature.

34.     On or about November 15, 2017, in accordance with the Memorandum, Energy Republic wire transferred $399,970 to Company A's bank account in the United States.

## Conclusion

35.     I respectfully submit that this affidavit establishes probable cause to conclude that MOJTABA BIRIA has committed the following offenses: conspiracy to violate the International Emergency Economic Powers Act, 50 U.S.C. § 1705(a), (c), and the Iranian Transactions and Sanctions Regulations, 31 C.F.R. Part 560; conspiracy to defraud the United States by fraudulently depriving OFAC of information it needs to carry out its lawful functions, in violation of 18 U.S.C. § 371; and conspiracy to commit international money laundering in violation of 18 U.S.C. § 1956(a)(2)(A), by transferring money from a place outside the United

States and to the United States, with the intent of promoting the carrying on of specified

unlawful activity as defined at 18 U.S.C. § 1956(c)(7)(D): a violation of section 206 of the

International Emergency Economic Powers Act (50 U.S.C. § 1705).

Gina Makowski
Special Agent
U.S. Department of Commerce,
Bureau of Industry and Security,
Office of Export Enforcement

Sworn to before me this
22nd day of November, 2017

Hon. Christian F. Hummel
United States Magistrate Judge

14